UNITED STATES DISTRICT COURT                    C/M
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                                      :
TERRANCE BREAZIL,                                     :
                              Petitioner,             :       **MEMORANDUM**
                                                      :       **DECISION AND ORDER**
               - against -                            :
                                                      :       15 Civ. 1912 (BMC)
SUPERINTENDENT ARTIS,                                 :
                                                      :
                              Respondent.             :
---------------------------------------------------------- X

**COGAN**, District Judge.

Petitioner seeks habeas corpus relief under 28 U.S.C. § 2254, vacating his conviction for

second degree murder, attempted second degree murder, and criminal possession of a weapon,

for which he received an aggregate sentence of fifty years to life as a second violent felony

offender.  This was his second conviction for these same crimes.  His first conviction was

vacated and a new trial ordered after a § 440 court found, and the Appellate Division affirmed,

that he was illegally stopped and frisked, and thus the murder weapon seized during that stop

should have been suppressed.  People v. Breazil, 52 A.D.3d 523, 860 N.Y.S.2d 137 (2d Dep't),

leave to app. denied, 11 N.Y.3d 830, 868 N.Y.S.2d 608 (2008) (table).  Petitioner was retried

without the murder weapon and again convicted; this time, his conviction was affirmed by the

Appellate Division.  People v. Breazil, 110 A.D.3d 913, 973 N.Y.S.2d 299 (2d Dep't), leave to

app. denied, 22 N.Y.3d 1039, 981 N.Y.S.2d 373 (2013) (table).  The time period between the

two trials was extensive: petitioner was first convicted in November, 1996; he was again

convicted at his retrial in October, 2009.

The facts will be set forth below as they relate to each of petitioner's points of error, but

to summarize, the jury found that petitioner had shot two men, Wendell Porter and McKiver

Kinard, multiple times in the street after getting upset that they were talking to his girlfriend, Elenora Carter. Carter was with her friend Amena Smith at the time of the shooting and Smith witnessed the shooting. Kinard died the next day from his wounds. By the time of petitioner's second trial, Porter had died from causes unrelated to the shooting.

Like his supplemental brief in the Appellate Division and his *pro se* motion under N.Y. C.P.L. § 440.10, the petition in this case raises many points of error, some of which overlap and some of which are compilations or contain references to others. I am reading the petition alongside petitioner's supplemental *pro se* brief in the Appellate Division and his § 440 motion in order to give his claims their broadest construction.[1] This requires, rather than proceeding strictly in the order in which his points are presented, partial reorganization of his points into their most applicable legal categories. Petitioner's points of error are as follows:

## I. Confrontation Clause Violation From the Use of Smith's Testimony at the First Trial

### A. Background

Smith had testified in great detail and with very specific recollection at petitioner's first trial as the prosecution's main witness. She described the events leading up to the shooting. She testified that petitioner fired six or seven shots into Porter and McKiver and then ran away. Petitioner was arrested, and Smith picked him out of lineup about two months after the shooting. At trial, she was cross-examined. She was a reluctant witness due to fear of being involved or retaliated against. She had to be arrested and handcuffed pursuant to a material witness warrant,

---

[1] Petitioner had not filed his § 440 motion at the time he commenced this proceeding. He asked me to stay this proceeding pending his opportunity to do so, and I granted that request up through the initial decision on his § 440 motion. As described below, that decision ultimately rejected his claims. Although petitioner could seek leave to reargue or appeal the denial of his § 440 motion to the Appellate Division, I decline to further extend the stay, as the claims are "plainly meritless" for the reasons stated below. See Rhines v. Weber, 544 U.S. 269, 277, 125 S. Ct. 1528 (2005); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

detained, and brought to court, and after trial, the District Attorney relocated her several times (each time after petitioner or his family found out where she was) because of her expressed fear of retribution, and the District Attorney subsidized her living expenses under the District Attorney's witness relocation program.

However, Smith did not testify for the prosecution at the second trial. Instead, the prosecution was permitted to read in her transcript from the first trial, direct and cross-examination, to the jury. The facts of how this occurred are somewhat complex.

Prior to petitioner's first conviction, a pretrial hearing was held pursuant to United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926 (1967), to determine whether Smith's identification of petitioner in a lineup was admissible. His motion to suppress the identification was denied. However, in 2009, after the Appellate Division affirmed the vacatur of the conviction, petitioner moved to reopen the Wade hearing. That motion was supported by an affidavit from Smith which a private investigator hired by petitioner's family had obtained. Although not completely recanting, Smith, both in that affidavit and in her testimony at the reopened Wade hearing, raised doubts about her prior testimony. She confirmed her prior identification but interjected that she "might have been mistaken" and suggested that the police had pressured her to identify petitioner in the lineup by showing her a photograph of petitioner before she saw him in the lineup. In contrast to her testimony at the first trial, Smith's testimony at the reopened Wade hearing was confused and contradictory; she equivocated and repeatedly denied recollection, and she also expressed uncertainty about some of the matters in her affidavit.

Significantly, she also admitted at the reopened Wade hearing that about five months after she had identified petitioner in the lineup (prior to the first trial), she had reported to the prosecutor that she had been threatened, and that she would refuse to testify at petitioner's (first)

trial. She confirmed at the reopened <u>Wade</u> hearing that she had only testified at the first trial because she had been arrested pursuant to the material witness warrant obtained by the prosecutor. She further testified at the <u>Wade</u> hearing that after the first trial, she had heard that petitioner's brother was looking for her and she had reported this as a threat to the prosecutor.

In addition to Smith's testimony at the reopened <u>Wade</u> hearing, the prosecution called other witnesses, including one of the detectives involved in the arrest. To the extent Smith contradicted her prior testimony and referred to pressure to pick petitioner out of the lineup, the detective contradicted her testimony at the reopened <u>Wade</u> hearing.

The hearing court denied the renewed motion to suppress the lineup identification. It found the testimony of petitioner's investigator who had obtained Smith's affidavit, to the effect that he knew nothing about the case and had not suggested Smith's desired answers to his questions, "absolutely incredible." It concluded that petitioner's mother, who had also testified at the hearing and who the court similarly found incredible (and who was later caught taking video of the victim's family members inside the courtroom at petitioner's second trial), had paid the investigator to come up with a clean statement from Smith to support the motion and to conceal the fact that petitioner and his family had undertaken a successful campaign to intimidate Smith into not remembering what she had seen. It found "beyond any question" that there was a "history of witness intimidation of Ms. Smith" and that Smith was in fear when she testified at the hearing.

Although the prosecutor had prevailed at this reopened <u>Wade</u> hearing, it obviously left her with a problem. Smith's partial recantation, professed lack of memory, and fearful demeanor made it difficult to rely on her at the second trial. Accordingly, the prosecutor moved for what is known in New York practice as a <u>Sirois</u> hearing (from <u>In the Matter of Holtzman v. Hellenbrand</u>,

92 A.D.2d 405, 460 N.Y.S.2d 591 (2d Dep't 1983)), also known as a Geraci hearing (from People v. Geraci, 85 N.Y.2d 359, 365-66, 625 N.Y.S.2d 469 (1995), which permits the use of prior statements of a witness, whether the statement has been previously confronted or not, as substantive evidence when a defendant's misconduct has caused the witness to be unavailable.

At that hearing, which occurred right before the jury was empaneled for trial, Smith refused to appear; the judge signed a material witness order for her arrest again and detectives brought her to court, reporting that she was "screaming" and upset. She essentially refused to cooperate at the hearing, declining to answer some questions and professing lack of recollection and uncertainty as to others that she had answered at the first trial. She stated expressly that she did not want to remember what had happened. When the judge asked her if anyone had intimidated her, she told the judge that he was "crazy" if he thought she was going to name names. "I'm not indicating somebody else name in this that told, told me something, for my own good." (sic).

Nevertheless, she testified generally about quite a bit of intimidation when pressed. She acknowledged that she had visited petitioner in jail to find out if he was angry with her for not recanting, and that she deliberately lied to the prosecutor to conceal that visit. She had decided to make the visit after someone had told her that petitioner wanted her to come to court and say the police had pressured her into her original testimony. She testified to efforts that petitioner's mother had made to contact her. At the end of her testimony, the judge instructed her again to identify the people who had threatened her, and she again refused.

Additional evidence of intimidation in the Sirois hearing came from the prosecutor in the first trial, ADA Mortenson. Mortenson testified to several fearful exchanges Smith had initiated with her, reporting threats of "a bullet in her head;" to "torch" her (at the Sirois hearing, Smith

denied that she had used the term "torch" to Mortenson), and similar acts of intimidation. Mortenson took the threats seriously enough that not only did she keep detectives assigned to Smith during the trial, but after the trial, as noted above, she relocated Smith and provided funds to subsidize Smith's living expenses. After the vacatur of his conviction and while the parties were preparing for a second trial, Smith was contacted by a man she would identify to Mortenson only as "Squirrel," who told her that she had to come to court and say the police had pressured her to identify petitioner. Squirrel said that petitioner "did not want to hurt her," the implication of course being that he would if she again testified against him.

Based on this and other evidence of intimidation, including telephone call records which circumstantially suggested that petitioner had used his mother, brother, girlfriend, and others to "get to" Smith, the hearing court found that Smith had been intimidated into giving false testimony or refusing to recollect the events as a result of a number of threats which petitioner had orchestrated or in which he had acquiesced. The court found that petitioner had succeeded in fatally undermining Smith's value as a witness for the prosecution because she would have greatly reduced credibility if she testified for the prosecution at the second trial.

Armed with this <u>Sirois</u> ruling, the prosecutor elected not to call Smith at petitioner's second trial. Over objection, the prosecutor simply read in Smith's testimony, direct and cross, from the first trial. The remainder of the prosecution's case consisted of police officer testimony about what they found when they arrived at the scene, and the pathology and ballistics analyses. The prosecutor, although not calling petitioner's girlfriend Carter, introduced telephone records showing 700 calls between petitioner and Carter from 2007 to 2009. The telephone records were offered to corroborate Smith's testimony that Carter was petitioner's girlfriend, and also so that

the prosecution could explain to the jury why it had not called Carter as a witness, i.e., because it considered her biased in favor of petitioner.

Ironically, petitioner's counsel then called Smith as a witness during his case. That wasn't easy either. She had ignored defense counsel's subpoena; the trial court therefore issued another material witness warrant for her arrest. Before it could be executed, Smith called the District Attorney's Office asking if she was going to be arrested because she heard there was a warrant out on her – someone on the defense side had apparently communicated its issuance to her.

The warrant was executed and Smith testified for the defense. Like her testimony at the Wade and Sirois hearings, it was equivocal and confused, with frequent denials of recollection as to details she had clearly remembered at the first trial. But some of it did implicate petitioner, at least in terms of confirming that she had given testimony inculpating him at the first trial. She also testified on the prosecutor's cross to some of the acts of intimidation she had suffered and to the fact that the District Attorney had relocated and was paying her under the witness relocation program.

The Appellate Division held that, "[c]ontrary to the defendant's contention, the court properly determined, after a *Sirois* hearing … that the testimony of a witness given at the first trial was admissible on the People's case-in-chief at the second trial. The People established, by clear and convincing evidence, that the witness was unavailable and that the unavailability was procured by misconduct on the part of the defendant." Breazil, 110 A.D.3d at 913 (citations omitted).

**B. Analysis**

 The Supreme Court authority on the use of prior witness testimonial statements in a manner consistent with the Confrontation Clause is fairly well-established:  (a) a witness must be unavailable if the prosecution wants to use her prior statements; (b) if her prior statements consist of previously confronted (cross-examined) testimony, no more is required for admission than her unavailability; (c) if her prior statements consist of non-confronted testimonial evidence, like statements to the police during an investigation or testimony before a grand jury, then those statements will be admissible only if she is unavailable *and* the defendant caused her unavailability.  See Giles v. California, 554 U.S. 353, 358, 128 S. Ct. 2678, 2682 (2008) ("The [Sixth] Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."); Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374 (2003) ("Where testimonial evidence is at issue … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); California v. Green, 399 U.S. 149, 165, 90 S. Ct. 1930, 1938 (1970): ("We also think that [the witness's preliminary hearing testimony was admissible as far as the Constitution is concerned wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial.  For [the witness's] statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial.").

 The determination of whether a defendant has caused the unavailability of a witness is a factual issue.  Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003).  Under 28 U.S.C. § 2254(d)(1), in

reviewing a state court conviction, the federal habeas corpus court can only grant relief from a factual determination if it was "based on an unreasonable determination of the facts in light of the evidence presented in a state court proceeding." Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1). See Burt v. Titlow, ___ U.S. ___, 134 S. Ct. 10, 15 (2013). A determination of fact is not unreasonable merely because it is incorrect – the standard is "substantially higher." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939 (2007). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's ... determination.'" Wood v. Allen, 558 U.S. 290, 301, 130 S.Ct. 841 (2010) (quoting Rice v. Collins, 546 U.S. 333, 341-42 (2006)). Rather, a petitioner must prove that the state court's finding was "objectively unreasonable." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S.Ct. 1029 (2003). Objective unreasonableness means that the state court's factual determination "cannot be reasonably reconciled" with the record that was before the state court. Jones v. Murphy, 694 F.3d, 225, 235 (2d Cir. 2012).

The Second Circuit confronted facts similar to those here in Cotto. There, the witness, although initially giving a false name to the police and denying that he had witnessed a shooting, later gave a statement to the police that he had seen the defendant shoot the victim. As trial approached, he contacted the detectives who had taken his statement and sought to retract it. On the eve of trial, he called the prosecutor to report that he was afraid for his family if he testified, and that if called as witness, he would say nothing to implicate the defendant. Sure enough, that's what he did when the prosecutor called him at trial the next day, testifying that someone unknown to him had shot the victim. The trial court interrupted the trial to conduct a Sirois

hearing, and found on the basis of circumstantial evidence that the defendant had threatened the witness and that was why the witness was refusing to acknowledge his prior statements. The state court permitted the police officer who had taken the witness's statement to advise the jury of the prior statements. Moreover, the trial court held that by engaging in this conduct, the defendant had forfeited his right to cross-examine the witness.

Recognizing the broad deference given to trial courts on findings of fact, the Second Circuit held that although there were arguments that could be made about weighing the circumstantial evidence to reach a conclusion that the defendant was responsible for the witness's change of story, that was not sufficient under AEDPA. "Given the extremely narrow scope of our review, we cannot reverse the trial court's finding that Cotto was behind the intimidation of [the witness] as an 'unreasonable determination of the facts in light of the evidence presented'." Id. at 233 (quoting 28 U.S.C. § 2254(d)(2).[2]

There are a few distinctions between the instant case and Cotto, but they virtually all cut against petitioner's claim. Most importantly, unlike Cotto, Smith's prior statements inculpating petitioner did not consist of statements given to police officers. Smith's statements were testified to in front of petitioner's prior jury, and fully subjected to cross-examination. Indeed, the fact that petitioner had already cross-examined Smith at a time when his interests were identical to those at his second trial – that is, during his first trial – compels the conclusion that it really did not matter if her change of testimony was due to petitioner's interference or not – as noted above,

---

[2] Dictum in Perkins v. Herbert, 596 F.3d 161, 173 (2d Cir. 2010), found constitutional error on somewhat similar facts, save one crucial distinction: the Appellate Division had expressly found that it was an accomplice of the defendant, not the defendant himself, who had intimidated the witness. Because the accomplice had just as much motive to intimidate the witness as the defendant, and the prosecution proved nothing with regard to defendant other than a shared motive to intimidate – indeed, unlike the instant case, not even an opportunity to intimidate the witness – the Second Circuit held that the introduction of the witness's grand jury testimony was error, albeit harmless error.

prior confronted testimony satisfies the Confrontation Clause as long as the witness is unavailable.  See California v. Green, 399 U.S. at 165, 90 S.Ct. at 1938.

Petitioner contends that since he was able to call Smith during his case, she was not "unavailable" and thus her testimony could not be used.  However, as Cotto further illustrates, the Supreme Court has never held that "unavailability" requires physical unavailability; a deliberate refusal of a witness to accurately recollect prior testimonial statements (as opposed to an unintended loss of recollection over time) also renders the witness unavailable.[3]  See also Geraci v. Senkowski, 211 F.3d 6, 9 (2d Cir. 2000) ("A witness who is so fearful that he will not testify or will testify falsely, is just as unavailable as a witness who is dead or cannot be found.") (citation and internal quotation marks omitted).  Cf. Fed. R. Evid. 804(a)(2) and (3) (a witness who "refuses to testify about the subject matter despite a court order to do so" or who "testifies to not remembering the subject matter" is deemed unavailable).  Smith amply demonstrated her unavailable under this definition at both the Wade and Sirois hearing,

Second, unlike in Cotto, the trial court in the instant case did not order, and the prosecution did not even ask it to order, that petitioner had forfeited his right to cross-examine

---

[3] Petitioner also raises a claim that of "prosecutorial misconduct" because the prosecutor argued that Smith was "unavailable" when, in fact, the prosecutor had frequent contact with Smith and the ability to produce Smith pursuant to a material witness arrest warrant.  The Appellate Division held this argument among those that were unpreserved and without merit.  Even without regard to preservation, physical availability, as noted above, is not the same as legal availability, so the Appellate Division's alternative holding on the merits was not contrary to or an unreasonable application of any Supreme Court authority.

In addition, petitioner argued evidentiary error by reason of the use of hearsay at the Sirois hearing.  Again, I need not consider the Appellate Division's finding that this argument was unpreserved, because the law is clear that hearsay is admissible at such a hearing.  See e.g Ridgeway v. Conway, No. 10 Civ. 6037, 2011 WL 3651147, at *10 (W.D.N.Y. Aug. 18, 2011); Geraci v. Senkowski, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998) ("'[S]uccessful witness intimidation would often not be provable at all if hearsay were not permitted,' since the most direct source of evidence of intimidation is the very witness whose intimidation prevents him or her from testifying in the first place.") (quoting United States v. Mastrangelo, 693 F.2d 269, 273 (2d Cir. 1982)), aff'd, 211 F.3d 6 (2d Cir. 2000).

Smith by reason of his misconduct.[4]  In fact, petitioner was permitted to call Smith as a witness

during his case, and to question her as a hostile witness.  The jury was therefore able to

determine which of her recollections to accept.  Thus, petitioner confronted Smith not once, but

twice – once at his first trial, and again, on the identical testimony, at his second.  This further

distances the instant case from a Confrontation Clause violation.

Even if it were necessary under the Confrontation Clause to review the state courts'

finding that petitioner was responsible for Smith's unavailability, his claim fails for the same

reason the argument failed in Cotto.  His point to the Appellate Division was that there was no

direct evidence that he personally intimidated Smith or sent others to do so on his behalf.  For

example, he asserted that there was no evidence as to the actual identity of "Squirrel" or that he

was affiliated with petitioner.

Under the narrow standard for reviewing state court factual determinations, a possible

contrary factual finding is an insufficient basis for habeas corpus relief.

> No constitutional imperative requires that a finding of such a forfeiture be
> supported by unambiguous, overwhelming or direct evidence of the role of the
> accused in threatening a witness. All that is required is evidence showing it more
> likely than not that the accused knew of and acquiesced in such conduct.

Drummond v. Cunningham, No. 08 Civ. 4290, 2010 WL 5583116, at *9 (E.D.N.Y. Dec. 13,

2010), report and recommendation adopted, 2011 WL 132379 (E.D.N.Y. Jan. 17, 2011).  Indeed,

the Second Circuit has suggested that a defendant's mere knowledge of efforts undertaken by

others on his behalf plus a failure to report them is a sufficient basis to warrant forfeiture by

misconduct.  See Mastrangelo, 693 F.2d at 273-74.  In the instant case, there was plenty of

evidence to support the hearing court's finding.

---

[4] In fact, Cotto resulted in the issuance of the writ because of the trial court's preclusion of cross-examination.

There was, for example, no logical conclusion as to at whose behest Squirrel was acting other than petitioner; there is no reason to be believe that Squirrel was just a gratuitous intermeddler. Intimidation is rarely carried out face to face, especially when the intimidator is in custody, and even the agents of the intimidator rarely expressly state that they are agent acting on the intimidator's behalf. See Miller v. Racette, No. 11 Civ. 426, 2012 WL 1999490, at *9 (W.D.N.Y. June 4, 2012) (denying habeas relief where state court had found that "[o]bviously, the only person who would benefit from these witnesses changing their story" was the petitioner); Geraci v. Senkowski, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998) (judges may "use their common sense in drawing inferences" to make their determination at Sirois hearing), aff'd, 211 F.3d 6 (2d Cir. 2000). Yet even with those difficulties of proof, the prosecution showed that petitioner managed to have a one-on-one encounter with Smith while he was in custody, which made her feel intimidated, and at least one of his agents said that he, petitioner, "didn't want to hurt her." The hearing court specifically found, based on circumstantial evidence, that it was at this meeting that petitioner reached a bargain with Smith not to harm her if she backed off her prior testimony. There was also evidence of telephone calls between petitioner and intermediaries who then reached out to Smith. And there was evidence that petitioner's mother, brother, and girlfriend all played a role in the intimidation. See Drummond, 2010 WL 5583116, at *10.

A habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court ...." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843 (1983). The hearing court's findings as to Smith's credibility have to be viewed in light of the evidence of deliberate intimidation of Smith, multiple instances starting with the first trial and continuing through the second. These were sufficiently numerous that, even on *de novo*

review, I would find it incredible that others were acting on petitioner's behalf but without his blessing. I therefore certainly cannot find the state courts objectively unreasonable for concluding "beyond any question" that petitioner subjected Smith to a "history of intimidation" and that is why she did not want to remember.

## II. Due Process Violation for Mistaken Repetition of a Question that the Trial Court had Stricken

### A. Background

After petitioner called Smith as a witness during his case at trial, the prosecutor cross-examined her. Similar to the exercise during the <u>Wade</u> and <u>Sirois</u> hearings, the prosecutor sought to show on cross that Smith was biased as a result petitioner's efforts to use others to interfere with her testimony.

In her grand jury testimony, Smith had testified as follows:

QUESTION: And you spoke to her a second time that day, her being Elenore Carter, did she say anything else to you about not saying anything?

ANSWER: I talked about that we talked about that I said I wasn't going to say something, nothing. We just talked about how it happened. She said she was trying to prevent this but he not going to listen to me.

At trial, the prosecutor asked whether Carter (petitioner's girlfriend) had called Smith to urge her not to not to tell the police what she had seen. When Smith disclaimed memory of such a conversation, the prosecutor read her the above-quoted grand jury testimony, asking her if she had been asked that question and given that answer. Before Smith could answer, defense counsel objected. The trial court sustained the objection and instructed the jury to disregard the question.

During jury deliberations, the jury requested a read-back of Smith's testimony. In reading it back, however, the trial court mistakenly included the above-referenced question quoting Smith's grand jury testimony. It caught its mistake immediately, and again instructed the jury to disregard the question. Petitioner, nevertheless, moved for a mistrial on the ground that reading back the stricken question had caused him prejudice that could not be cured by the Court's second instruction to the jury to disregard it.

In the Appellate Division, petitioner argued that the failure to grant a mistrial amounted to a denial of due process. The Appellate Division disagreed, holding:

> The court quickly discovered the error and gave a curative instruction to the jury that it was not to consider the testimony, and the jury is presumed to have followed the court's instructions. In any event, the error was harmless, as the evidence of defendant's guilt was overwhelming, and there was no significant probability that the error contributed to the defendant's conviction.

Breazil, 110 A.D.3d at 914 (citations omitted).

## B. Analysis

Because the Appellate Division decided this point on the merits, its decision attracts the provisions of 28 U.S.C. § 2254(d)(1). That statute requires petitioner to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495 (2000) (internal quotation marks omitted). A state court decision involves "an unreasonable application" of clearly established federal law if the state court applies federal law to the facts of the case "in an objectively unreasonable manner." Brown v. Payton, 544 U.S.

133, 141, 125 S. Ct. 1432 (2005).  The Supreme Court has made clear that the AEDPA standard

of review is extremely narrow, and is intended only as "a guard against extreme malfunctions in

the state criminal justice systems, not a substitute for ordinary error correction through appeal[.]"

Ryan v. Gonzales, ___U.S.__, 133 S. Ct. 696, 708 (2013).  "A state court's determination that a

claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 88, 131 S. Ct.

770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004)).

Since Harrington, it has repeatedly admonished Circuit Courts for not affording sufficient

deference to state court determinations.  See, e.g., White v. Wheeler, 577 U.S. __, 136 S. Ct.

456, 460 (2015) ("This Court, time and again, has instructed that AEDPA, by setting forth

necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier

to federal habeas relief for prisoners whose claims have been adjudicated in state court'",

quoting, Burt v. Titlow, 571 U. S. ___, __, 134 S. Ct. 10, 16 (2013))

There is of course no Supreme Court case that addresses this situation, and thus the

issue is whether the Appellate Division decision was an unreasonable application of Supreme

Court precedent.  Because petitioner relies generally on due process considerations without

reference to any specific case, the state courts had considerable latitude to determine whether a

due process violation had occurred.  As the Supreme Court noted in Yarborough, 541 U.S. at

664, 124 S. Ct. 2140: "Applying a general standard to a specific case can demand a substantial

element of judgment.  As a result, evaluating whether a rule application was unreasonable

requires considering the rule's specificity.  The more general the rule, the more leeway courts

have in reaching outcomes in case-by-case determinations."

The most analogous body of Supreme Court case law is that addressing evidentiary errors that are sufficiently egregious to constitute a denial of due process. This is because petitioner is essentially alleging that as a result of the trial court's error, the jury became exposed to information at trial that should have been excluded. But the standard for habeas corpus relief for an evidentiary error is difficult to meet. It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983); accord Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (internal quotation marks and citation omitted)). For a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, a petitioner must "show that the error deprived [him] of a fundamentally fair trial." Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004) (per curiam) (quoting Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988)).

Petitioner cannot make that showing for at least two reasons. First, I see no constitutional or even an evidentiary principle that mandated sustaining the objection in the first place. The prosecutor's question was entirely proper. The fact is that to the extent the question was prejudicial (and as discussed below, it was not very prejudicial considering how thoroughly Smith's credibility at the second trial was otherwise probed), the trial court gave petitioner an evidentiary break by sustaining the objection.

Smith's credibility was very much in issue as a defense witness. Smith disclaimed memory of her conversation on this issue with Carter. The prosecutor could either refresh her recollection with her prior testimony, or the prosecutor had a good faith basis for impeaching Smith's partial recantation, as her grand jury testimony suggested bias or fear of giving truthful testimony and offered an explanation for her lack of recollection. Cf. Drummond, 2010 WL

5583116, at *11 ("In this case, the possibility of prejudice is diminished considerably by the fact that, had the trial court ruled in petitioner's favor at the <u>Sirois</u> hearing, the prosecution, under New York law, could nevertheless have introduced the challenged grand jury testimony as past recollection recorded"). The statements that Smith told the grand jury that Carter had made went directly to Smith's motivation in changing her story from the first trial, and to the genuineness of her lack of recollection.

Indeed, Carter's statements to Smith were probably not even hearsay; they were not offered for the truth of anything they asserted, but to show that Smith had been given a motive to forget the details of the murder to which she had testified previously. This is classic impeachment by reason of motivation to dissemble or deliberately not remember. Thus, because I would find no constitutional violation if the trial court had allowed the prosecutor to put the question to Smith, I certainly cannot find any just because the trial court decided to strike the question twice. At the very least, petitioner has not met the heavy burden required to show evidentiary error as the basis for habeas relief.

Second, even if the Constitution somehow required the trial court to sustain the objection, I cannot find that the Appellate Division was also wrong in concluding that any error was harmless. My review of the Appellate Division's finding of harmless error is constrained by <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 631, 113 S. Ct. 1170 (1993). This requires petitioner to demonstrate that the erroneous reading had a "substantial and injurious effect" on the jury's verdict. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 127 S. Ct. 2321 (2007) (<u>Brecht</u> standard applies on federal habeas corpus review). This one question, twice stricken, had no such effect.

The Appellate Division stressed the immediate curative instruction. It observed that under New York law, juries are presumed to follow such instructions, a principle that is equally

ensconced in federal law.  See Greer v. Miller, 483 U.S. 756, 766 26 n.8, 107 S. Ct. 3102, 3109

(1987) (Where an inadmissible statement is followed by a curative instruction, the court must

assume "that a jury will follow an instruction to disregard inadmissible evidence inadvertently

presented to it, unless there is an overwhelming probability that the jury will be unable to follow

the court's instructions, . . . and a strong likelihood that the effect of the evidence would be

devastating to the defendant.") (internal quotation marks omitted); Richardson v. Marsh, 481

U.S. 200, 206, 107 S. Ct. 1702, 1707 (1987) (underscoring the "invariable assumption of the law

that jurors follow their instructions"); Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S. Ct.

1965, 1977 (1985) (citations omitted).  Perhaps most importantly, the record also shows that this

unanswered question was a trivial part of the cross-examination, and that the prosecution asked

numerous questions that even more pointedly showed that Smith felt intimidated.

Given the doubly-deferential standard arising from the combination of the restricted

scope of habeas review and the latitude given to evidentiary rulings, the Appellate Division's

decision was neither contrary to nor an unreasonable interpretation of Supreme Court authority.

### III. Legal Sufficiency of the Evidence

In his petition, petitioner asserts that "The Verdict was against the weight of the evidence

depriving Appellant's [sic] due process of law, U.S. Const. Amendment, XIV."  This merges two

distinct arguments – discretionary weighing of the evidence and legal sufficiency.  The former is

not cognizable on federal habeas corpus because it raises only a state law issue.  See, e.g.,

Scission v. Lempke, 784 F. Supp. 2d 237, 243 (W.D.N.Y. 2011).  Even though the substance of

petitioner's argument, both in his petition and to the Appellate Division,  goes entirely to weight

and not legal insufficiency,  I will assume that he is also arguing legal insufficiency, since he has

invoked the due process clause in his petition and in his brief to the Appellate Division and,

importantly, the Appellate Division found the evidence was legally sufficient to sustain his conviction: "Viewing the evidence in the light most favorable to the prosecution, we find it was legally sufficient to prove the defendant's guilt …." <u>Breazil</u>, 110 A.D.3d at 913 (citations omitted).

The standard for reviewing claims of legal insufficiency is well established. The inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). Thus, even when "faced with a record of historical facts that supports conflicting inferences, [the habeas court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 326. Relief on a sufficiency claim cannot be granted unless the record is "so totally devoid of evidentiary support that a due process issue is raised." <u>Bossett v. Walker</u>, 41 F.3d 825, 830 (2d Cir. 1994) (internal quotation marks omitted).

Because petitioner's argument is directed entirely towards weighing the evidence, he cannot meet this standard. All that he has done is pick out those portions of Smith's testimony that favor him and assert that they show that her original testimony inculpating him should not be believed. For example, he points to Smith's testimony at one of the hearings in which she agreed with trial counsel's suggestion that the police threatened to arrest her as an accomplice in the shooting. But all of these arguments were made to the jury, and the jury rejected them. Although I do not agree with the Appellate Division's conclusion that the evidence against petitioner was "overwhelming", <u>Breazil</u>, 110 A.D.3d at 914 – this was essentially a swearing contest between two versions of one witness's testimony – the jury was not irrational in

concluding that Smith's prior testimony, given before many of the acts of intimidation that came out in her cross-examination at trial, was truthful whereas her deliberate lack of recollection fifteen years later was not. It was neither contrary to nor an unreasonable application of any Supreme Court authority for the Appellate Division to reach the same conclusion.

**IV. Suppression of Smith's Pretrial Lineup Identification – Fourth Amendment**

As noted above, the Appellate Division had held that petitioner's illegal stop and frisk required suppression of the murder weapon that he was found to be carrying. The Appellate Division also, however, rejected his claim that Smith's post-arrest lineup identification of petitioner should have been suppressed as "fruit of the poisonous tree" in connection with that arrest. People v. Breazil, 52 A.D.3d 523, 524-25 (2d Dep't 2008). After his retrial and conviction, petitioner reprised his claim on appeal that the identification should have been suppressed as the product of the illegal search. The Appellate Division again rejected this claim on the basis that it had already rejected it in the prior appeal:

> The defendant's contention, raised in his pro se supplemental brief, that the pretrial lineup identification should have been suppressed as the fruit of an illegal arrest, was previously rejected by this Court on a prior appeal. That determination "constitutes the law of the case, and, absent a showing of manifest error in the prior decision or that exceptional circumstances exist warranting departure from the law of the case doctrine, the defendant is precluded from having this issue reconsidered." Under the circumstances presented here, there is no basis to reconsider that issue.

Breazil, 110 A.D.3d at 914 (citations omitted).

Law of the case can constitute an independent and adequate state law ground that constitutes a procedural bar preventing federal habeas corpus review. See Riley v. Conway, No. 06 Civ. 1234, 2011 WL 839477, at *4-5 (E.D.N.Y. March 7, 2011). On the other hand, it might be exorbitant for me to apply it here. After his first conviction, petitioner raised this claim in a prior habeas corpus petition in this Court. See Breazil v. Herbert, No. 01 Civ. 3253, ECF No.16

(E.D.N.Y. June 18, 2002). Judge Weinstein stayed that petition pending petitioner's exhaustion of his state law claims. That first petition became moot when the Appellate Division reversed petitioner's conviction on related grounds and ordered a retrial. Smith's prior identification was again admitted at the second trial.

Thus, the Appellate Division rejected this claim on the merits, and petitioner sought federal habeas corpus review, but has had no opportunity to obtain it. Under these circumstances, there might seem something inappropriate about denying him federal review of a timely raised federal claim based on a state law ground, where he did everything he could under state law to properly assert the claim.

But whether or not petitioner's claim is procedurally barred, it is still a Fourth Amendment claim based on invocation of the exclusionary rule, and thus federal habeas corpus review is subject to the rule of Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037 (1976). There, the Supreme Court held that federal habeas corpus review is unavailable for Fourth Amendment claims where the petitioner has had the opportunity to fully litigate the claim in state court: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494, 96 S. Ct. at 3052. The Supreme Court reasoned that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." Id. at 494-95, 96 S. Ct. at 3052-53.

Based upon Stone, the Second Circuit has held that habeas review of decisions implicating the exclusionary rule is limited to situations in which "the state provides no

corrective procedures at all to redress Fourth Amendment violations," or where there is a corrective procedure "but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process."  Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc).  Courts have repeatedly recognized that New York provides an adequate corrective procedure for Fourth Amendment claims.  See, e.g., Capellan v. Riley, 975 F.2d 67 (2d Cir. 1992); Guzman v. Greene, 425 F. Supp. 2d 298 (E.D.N.Y. 2006); Crispino v. Allard, 378 F. Supp. 2d 393 (S.D.N.Y. 2005).  For this reason, courts within this Circuit have almost uniformly held that challenges to a state court's rulings as to the reach of the exclusionary rule are not reviewable under Stone v. Powell.  See e.g., Philbert v. Brown, No. 11 Civ. 1805, 2012 WL 4849011 (E.D.N.Y. Oct. 11, 2012); Garcia–Lopez v. Fischer, No. 05 Civ. 10340, 2007 WL 1459253 (S.D.N.Y. May 17, 2007); Crispino, 378 F. Supp. 2d at 412-13.[5]

Here, there is no question of the adequacy of the state law remedy.  Petitioner moved and fully litigated the Fourth Amendment issues through a hearings court and both levels of appellate review.[6]  He actually prevailed on this issue in the hearing court but the Appellate Division

---

[5] In Young v. Conway, 698 F.3d 69 (2d Cir. 2012), rehearing en banc den., 715 F.3d 79 (2d Cir. 2013), the Second Circuit exercised its discretion to decline application of Stone v. Powell and undertook a review of the merits of an independent source determination where the State had failed to raise Stone v. Powell in the district court. The Circuit held that Stone v. Powell is a prudential and equitable, not jurisdictional, doctrine that can therefore be waived.  However, in support of its holding of the nonjurisdictional nature of Stone v. Powell, the Circuit cited Davis v. Blackburn, 803 F.2d 1371 (5th Cir. 1986) (per curiam). See Young, 698 F.3d at 86 n. 10.  Davis, like all other cases that have considered the issue, also held that a federal court, in the exercise of discretion, may raise Stone v. Powell sua sponte.  See, e.g., United States. v. Ishmael, 343 F.3d 741 (5th Cir. 2003); Herrera v. Lemaster, 225 F.3d 1176 (10th Cir. 2000); Tart v. Massachusetts, 949 F.2d 490 (1st Cir. 1991); cf. Woolery v. Arave, 8 F.3d 1325, 1326-27 (9th Cir. 1993) (contrary to Young v. Conway, holding that district court must raise Stone v. Powell sua sponte if the State does not).  Because I have raised Stone v. Powell sua sponte as a matter of discretion prior to any submission by respondent, there is no issue of waiver.

[6] Petitioner raised his "fruit of the poisonouts tree" claim again in his § 440 motion.  He also added an additional theory – that the police lacked probable cause to place him in a lineup.  The § 440 court rejected these arguments, the former because the Appellate Division had already ruled against petitioner on this point in his first appeal and the latter because probable cause is not required to place a suspect in a lineup.  See People v. Breazil, No. 9013/95 (Sup. Ct. Kings Cnty. Dec. 4, 2015).  The § 440 court's decision on both of these Fourth Amendment arguments  is subject to the rule of Stone v. Powell and thus those arguments need not be reviewed here.

reversed.  Under these circumstances, the state courts have provided a full and fair opportunity to raise his Fourth Amendment claim, and he has no right to federal habeas corpus review.[7]

## VI. Claims Held to be Procedurally Barred

A federal court should not address the merits of a petitioner's habeas claim if a state court has rejected the claim on "a state law ground that is independent of the federal question and adequate to support the judgment."  Lee v. Kemna, 534 U.S. 362, 375, 122 S. Ct. 877, 885 (2002) (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991)). When a state court rejects a petitioner's claim because he failed to comply with a state procedural rule, the procedural bar may constitute an adequate and independent ground for the state court's decision.  See, e.g., Coleman, 501 U.S. at 729-30, 111 S. Ct. at 2554; Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007).  State procedural grounds are only adequate to support the judgment and foreclose federal review if they are "firmly established and regularly followed" in the state.  Lee, 534 U.S. at 376, 122 S. Ct. at 885 (quoting James v. Kentucky, 466 U.S. 341, 348, 104 S. Ct. 1830, 1835 (1984)).  If a state court rejects a specific claim on an adequate and independent state law ground, then a federal court should not review the merits of the claim, even if the state court addressed the merits of the claim in the alternative.  See Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S. Ct. 1038, 1044 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

---

[7] In his petition here and his supplemental *pro se* brief on appeal, petitioner also objected to the introduction of his arrest photograph in that it arose from his illegal arrest.  The Appellate Division held that this claim was unpreserved, as defense counsel had not moved to suppress the photograph, and had only objected to its introduction on authentication grounds.  That ruling was clearly correct and petitioner has shown no cause or prejudice to overcome the procedural bar.  But in any event, petitioner's claim would fail under Stone v. Powell for the same reason as his claim to suppress the lineup identification.

It is well settled that New York's contemporaneous objection rule, codified at N.Y. Crim. Proc. Law § 470.05(2), is an independent and adequate state law ground that ordinarily precludes federal habeas corpus review. See, e.g., Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011). New York's contemporaneous objection rule provides that a party seeking to preserve a claim of error at trial must lodge a protest to the objectionable ruling "at the time of such ruling ... or at any subsequent time when the [trial] court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2). This rule has been interpreted by New York courts to require, "at the very least, that any matter which a party wishes" to preserve for appellate review be "brought to the attention of the trial court at a time and in a way that gave [it] the opportunity to remedy the problem and thereby avert reversible error." People v. Luperon, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735 (1995); see also People v. Hicks, 6 N.Y.3d 737, 739, 810 N.Y.S.2d 396 (2005).[8] A "general objection is not sufficient," because, as "New York's highest courts uniformly instruct," to preserve a claim, a defendant must "specifically focus on the alleged error." Garvey, 485 F.3d at 714 (collecting state court authority).

Once it is determined that a claim is procedurally barred under state procedural rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546 (1991); Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989). The latter avenue, a miscarriage of justice, is demonstrated in extraordinary cases, such

---

[8] As his Seventh point of error in his habeas corpus petition, petitioner asserts that to the extent the Appellate Division found certain claims unpreserved, it committed error, because in fact petitioner had asserted these claims in a post-verdict motion under N.Y. C.P.L. § 330.30. That is obviously incorrect; a party cannot fail to preserve error during trial, wait until he is convicted, and then assert the error, as the trial court would have no opportunity to contemporaneously correct it.

as where a constitutional violation results in the conviction of an individual who is actually innocent.  Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639 (1986).

The first avenue, cause for the default and prejudice therefrom, can be demonstrated with "a showing that the factual or legal basis for a claim was not reasonably available to counsel, ... or that 'some interference by state officials' made compliance impracticable, ... [or that] the procedural default is the result of ineffective assistance of counsel."  Bossett v. Walker, 41F.3d 825, 829 (2d Cir. 1994) (citing Muray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986)).  Although, in some circumstances, ineffective assistance of counsel can constitute "cause" sufficient to avoid a procedural default, id., 477 U.S. at 488-89, 106 S. Ct. at 2645-46, the ineffective assistance claim must itself have been exhausted in the state court.  Edwards v. Carpenter, 529 U.S. 446, 451–52, 120 S. Ct. 1587, 1591-92 (2000).  To adequately exhaust a claim, a petitioner must have "fairly presented" the claim to the state court.  Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

In addition, even if there is neither manifest injustice or cause and prejudice resulting from the procedural default, there are occasional  "exceptional case[s]," in which the "'exorbitant application of a generally sound rule renders the state ground inadequate' and will not prevent a federal court's consideration of the federal question presented."  Fulton v. Graham, 802 F.3d 257, 262 (2d Cir. 2015), quoting Lee v. Kemna, 534 U.S. 362, 376, 122 S. Ct. 977 (2002).  To determine if the application of a state law rule is exorbitant, the court must consider

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;
>
> (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and

(3) whether petitioner had substantially complied with the rule ... and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (internal quotation marks omitted).

Although petitioner raised claims for ineffective assistance of trial counsel both in his *pro se* direct appeal brief and his § 440 motion, which are discussed below, he never argued, with respect to his second conviction, that his counsel was ineffective for failing to preserve the alleged errors which the state courts held were unpreserved. Accordingly, if petitioner is going to overcome the state courts' invocation of a procedural bar as to those claims in this habeas corpus proceeding, he needs to show either that the invocation of a procedural bar was exorbitant, or that it would constitute a manifest injustice for this Court to recognize the procedural bar. Those principles are applied as to each of his points below.

A. Telephone Records Claims

   i.   Background

As alluded to above, the prosecution offered records of 700 telephone calls between petitioner and Carter while he was in custody for the period 2007-2009. The records took two forms. First, there were records of calls received by petitioner while in custody. Because these were records of a City Agency (the Department of Corrections), the prosecution authenticated them with a certificate pursuant to N.Y. C.P.L.R. § 4518(c). Second, the prosecution had sought to introduce records of Carter's telephone to show that, when matched with Department of Corrections records, Carter had called petitioner over 700 times, thus establishing their relationship. Petitioner's attorney objected to both sets of records on two grounds: (1) the records were irrelevant; and (2) if relevant, they were not the best of evidence of calls between petitioner and Carter, as the prosecution could subpoena Carter to testify to the calls. The trial

court overruled these objections. Petitioner's counsel did not object on the ground of lack of authenticity or hearsay.

On the day the Sprint representative appeared, petitioner could not attend court because he had been injured in a fight while in custody, and so trial did not go forward. The Sprint representative was in attendance pursuant to subpoena, and was the prosecution's last witness. The defense had already examined Smith out-of-turn in its case and had no further evidence, so, in fact, the Sprint representative was the last witness in the case. She was flying out of town that evening and would not have been available for another five days. Instead of delaying the trial, defense counsel spoke to the representative off the record, satisfied himself that she could and would authenticate the records as business records, and then, out of the presence of the jury, stipulated on the record to the introduction on the telephone records, subject to his prior relevance and best evidence objections. On the next trial day, when petitioner was back in court, the trial judge received the records into evidence. It advised the jury that the parties had stipulated to the introduction of the telephone records, and that the jury could consider them only on the issue of whether petitioner had a relationship with Carter at the time of the crime.

In the Appellate Division and here, petitioner raised two objections to the introduction of these records: (1) there was an inadequate foundation; and (2) he was deprived of his right to be present during his trial because he was not in court when his attorney stipulated to the admission of the records.[9]

---

[9] Petitioner raised this latter claim again in his § 440 motion. The § 440 court held that this claim had been rejected on the merits in petitioner's appeal and absent a retroactive change in the law, relief based on thse claims could not be granted in a § 440 motion.

ii.    Analysis

Petitioner's lack of foundation argument was not only unpreserved, as the Appellate Division found, but affirmatively waived.  It is therefore procedurally barred.  The procedural bar cannot be excused due to prejudice, as even if the Sprint representative's testimony would have been necessary, the refusal to stipulate would merely have delayed the records' introduction by five days.  The decision not to insist on that does not constitute prejudice or manifest injustice.

As to petitioner's right to be present when the stipulation was made, I cannot agree with the Appellate Division to the extent it held that this claim was "unpreserved."  By definition, where a defendant's argument is that he should have been present at a particular point in the trial but was not, he has had no opportunity to address the issue contemporaneously.  Indeed, in responding to petitioner's supplemental *pro se* brief in the Appellate Division, the District Attorney never even argued that the claim was unpreserved, instead addressing the claim on the merits.  I therefore reject any procedural bar for this claim.

Nevertheless, because this claim fell under the Appellate Division's categorical rejection this claim in petitioner's supplemental *pro se* brief as "unpreserved, and, in any event, without merit," my review is subject to the standard of AEDPA deference described above.  See Zarvela v. Artuz, 364 F.3d 415, 417 (2d Cir. 2004) (extending AEDPA deference where "[t]he Appellate Division found petitioner's claim to be unpreserved, and, in any event, without merit, and therefore reviewed the claim on the merits.").  Petitioner again cannot meet that standard.

A defendant is entitled "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Faretta v. California, 422 U.S. 806, 819-20 n. 15, 95 S. Ct. 2525 (1975); see also Rushen v. Spain, 464 U.S. 114, 117-18, 104 S. Ct. 453 (1983) (presence at all critical stages of the trial is a "fundamental right[ ] of each criminal defendant"). This right is "scarcely less important to the accused than the right of trial itself," Diaz v. United States, 223 U.S. 442, 455, 32 S.Ct. 250 (1912). It derives from both the Sixth Amendment Confrontation Clause and the Due Process Clause. United States v. Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482 (1985); Illinois v. Allen, 397 U.S. 337, 338, 90 S. Ct. 1057 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial.") (citation omitted); Snyder v. Massachusetts, 291 U.S. 97, 1070808, 54 S. Ct. 330 (1934) ("[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence."), overruled in part on other grounds, Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489 (1964).

But the right to be present is not absolute. It attaches only when the presence of the defendant "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder, 291 U.S. at 105-06. The Supreme Court has emphasized that the right "is guaranteed ... if [the defendant's] presence would contribute to the fairness of the procedure," but that the right "is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658 (1987) (quoting Snyder, 291 U.S. at 106-07). Thus, "the accused has a right to be present at all material stages of trial", Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000), but a proceeding is "material" for this purpose only if the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge .... [T]he presence of a defendant is a condition of

due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Gagnon, 470 U.S. 522, 526, 105 S. Ct. 1482 (quoting Snyder, 291 U.S. 97, 105-06, 54 S. Ct. 330).

A defendant's exclusion from any aspect of the trial should therefore "be considered in light of the whole record." Gagnon, 470 U.S. at 526-27 (citing Snyder, 291 U.S. at 115). If the record demonstrates that the defendant's absence did not compromise the fundamental fairness of the trial proceedings, no violation of the right to be present has occurred. See Stincer, 482 U.S. at 36-47 (rejecting challenge to defendant's exclusion from witness competency hearing); Gagnon, 470 U.S. at 527 (rejecting challenge to defendant's exclusion from *in camera* discussion between trial judge and juror); Snyder, 291 U.S. at 106-22 (rejecting challenge to defendant's exclusion from jury visit to the crime scene). Additionally, there is no constitutional right to be present for conferences where only legal issues are addressed. See Key v. Artuz, No. 99 Civ. 161, 2002 WL 31102627, at *7 (E.D.N.Y. Sept. 16, 2002); cf. Fed.R.Crim.P. 43(a)(2) ("[a] defendant need not be present ... [where] [t]he proceeding involves only a conference or hearing on a question of law.").

The totality of the record demonstrates that petitioner was not absent from any material part of the trial. The jury was not brought into the courtroom that entire day; what effectively transpired was what would have been a short sidebar conference but for the jury's absence. The admission of telephone records is perhaps the most ministerial act in a trial and petitioner has indicated nothing to suggest how his presence would have borne on that process. See United States v. Doe, 964 F.2d 157, 159 (2d Cir. 1992) (appellant "does not claim that he would have added anything to the discussion or that he was otherwise prejudiced."); see also Yonamine v. Artuz, No. 00-2028, 2000 WL 1593300, at *1-2 (2d Cir. Oct. 18, 2000) (summary order)

(observing that there is no clearly established federal law as reflected in Supreme Court authority guaranteeing a defendant the right of presence at a conference between the trial judge and counsel at which legal issues are discussed). The foundation for some of the records, as noted above, was established by certificate under the C.P.L.R., and his counsel stipulated to their introduction anyway. The most petitioner could have achieved by his presence would have been to urge his counsel to force the Sprint witness return five days later and delay the trial for some reason that petitioner has not articulated.

Notably, although counsel's stipulation was placed on the record in petitioner's absence, the records themselves were not received into evidence until petitioner was present in court on the next trial day. He was therefore present at the more important moment when the evidence was received, although even the receipt of these obvious business records was ministerial. Under all of these circumstances, the Appellate Division's rejection of his claim was not contrary to or an unreasonable application of Supreme Court precedent.

B. Jury Instruction Claims

In the Appellate Division and his petition here, petitioner objects to two instructions given during jury deliberations.

First, after one day of deliberations, the jury advised the trial court that it could not reach a verdict. With the consent of the parties to the particular wording, the trial court delivered a modified charge pursuant to Allen v. U.S., 164 U.S. 492 (1896). I have reviewed it and there is neither prejudice nor manifest injustice that would relieve petitioner of the procedural bar. The charge was non-coercive and specifically advised the jury that while each member should exchange views and try to reach a verdict, "no juror should surrender his or her honest view of the evidence solely because he or she is outvoted or merely for the sake of returning a verdict."

Second, apparently after reviewing the petitioner's telephone records, the jury sent out a note asking whether Smith's telephone number appeared anywhere in the records. The trial court conferred with the parties and advised the jury that there was no evidence in the case as to what Smith's telephone number was so they could not tell, one way or the other, whether Smith's number was in the records. The supplemental instruction also advised the jury not to speculate about that.

It could be argued that the Appellate Division's finding that this claim was unpreserved was exorbitant. The instruction that the trial court gave was not defense counsel's first choice. He objected to the trial court's proposal because, he argued, the prosecution obviously knew at least one telephone number for Smith and thus could tell the jury whether or not it was in the telephone records, but the prosecutor responded that she did not know what other numbers Smith might have. The trial court then asked defense counsel if the charge that it was proposing was factually accurate, and defense counsel conceded that it was.

I suppose the Appellate Division could validly find the claim unpreserved because defense counsel never offered a proposal for responding to the jury's question and thus gave the trial court no way to cure any perceived deficiency in its proposal – obviously, failing to respond to the jury's question at all was not an option. The logical inference from defense counsel's point that the prosecutor had at least one telephone number would suggest a reopening of the record, his obtaining Smith's known telephone number from the prosecutor, and his comparing it to petitioner's telephone records to see if it appeared, and then advising the jury. But he never asked for that relief, perhaps because he recognized that it could turn out badly for petitioner, or because it was otherwise infeasible. Without a proposed form of action or request for relief, a generalized protest, as noted above, is insufficient under New York practice to preserve an

objection.  See People v. Ford, 69 N.Y.2d 775, 776 (1987); People v. Rivera, 73 N.Y. 2d 941, 941 (1989).

In any event, the Appellate Division's alternative holding that petitioner's claim was without merit precludes relief here.  There is no Supreme Court authority that the state courts unreasonably applied in finding that a factually accurate charge as to an inquiry that the record did not contain was appropriate.  Even on de novo review, I would find no impropriety in the supplemental charge.

### C.  Due Process Claim Based on Prosecutor Being an "Unsworn Witness"

As noted above, the prosecutor at petitioner's first trial was ADA Mortenson.  In addition to having learned of the threats to Smith from speaking with Smith in connection with preparing for that trial, ADA Mortenson was one of two prosecutors at petitioner's second trial.  In connection with that second trial, besides examining some of the witnesses, she (1) testified as a witness at the Sirois hearing about threats that Smith had reported to her, as noted above; (2) cross-examined Smith at trial when petitioner called Smith; (3) read to the jury, together with another prosecutor, Smith's testimony from the first trial; and (4) delivered the prosecution's summation.

Petitioner's claim in the instant petition and in his supplemental *pro se* brief in the Appellate Division is that because of her involvement with Smith both prior to and after the first trial, in which Smith conveyed the threats she had received to Mortenson, Mortenson should have recused herself from the second trial because she became an "unsworn witness."[10] Petitioner's point is that by cross-examining Smith during petitioner's defense case, and by

---

[10] Petitioner raised this claim again in his § 440 motion.  The § 440 court held that since the Appellate Division had already decided it against petitioner, it could not be raised again in a § 440 motion.  That disposition on state law grounds is not subject to review in this Court.

arguing Smith's credibility during summation based on the fact that Smith had been threatened, Mortenson displayed her own personal knowledge of the threats made to Smith and thus acted as both prosecutor and a witness.

Although the Appellate Division held that this claim was unpreserved, the issue, or at least others similar to it, was not entirely unmentioned by defense counsel. Just prior to trial, counsel moved to disqualify Mortenson. The relatively narrow ground for that motion was that the prosecution might need to call Mortenson as a witness to rebut Smith's anticipated testimony during the defense case. The trial judge ruled that:

> If [A.D.A. Mortensen is] going to cross-examine a witness about things she has personal knowledge of, I'll deal with the issue at that time to see how it would be handled. Maybe another prosecutor will have to do that. If it becomes an issue in summation where she is going to be vouching for her own credibility, I'll take measures to make sure that doesn't happen.

This put the ball in defense counsel's court to object if the problem which he foresaw actually occurred. Defense counsel, however, alluded to the issue only twice thereafter. First, during Smith's testimony from the first trial, she had authenticated, and the trial court had received in evidence, a photograph of petitioner. After the reading of that testimony during the second trial, Mortenson, out of the presence of the jury, attempted to put the picture into evidence, representing that it was the same exhibit which Smith had authenticated during the first trial. Defense counsel objected, essentially on the ground that Mortenson could not testify as a witness as to whether the picture was the same as the one used at the first trial. The trial court overruled the objection because, it found, the picture not only was vouched for by Mortenson, but it had a certification stamp from the first trial tending to show that it was the exhibit to which Smith had then testified.

Second, during closing argument, Mortenson, in arguing that the jury should believe Smith's testimony from the first trial but not her testimony for petitioner in the second trial, stated: "And then we have to consider her demeanor, that all important thing that we talked about so much in jury selection, her body language. Now you can't get the full impact of her body language from the readings of that transcript, no question about it, but you still get a glimpse of how she was acting when she testified, about how careful she was not to misspeak." Defense counsel objected on the ground that Mortenson "was interjecting the demeanor of the witness back then … not what was said, but how she looked or how she was staying back at the original trial." The trial court overruled the objection, stating that Mortenson "was asking the jury I think to draw an inference from the record. She wasn't asserting that ... [i]t was her recollection that [that] was how it took place."

Based on the trial court's initial ruling in denying the motion to disqualify Mortenson, but leaving the door open for petitioner to object if she interjected her personal knowledge into the case, the Appellate Division properly held that petitioner's argument was unpreserved. The very limited objections thereafter made by counsel bore little relationship to petitioner's argument in the Appellate Division and here that Mortenson's personal knowledge precluded her entirely from participating as trial counsel. If there were times when Mortenson's personal knowledge made her an unsworn witness, it was incumbent on petitioner, pursuant to the trial court's ruling, to point them out one at a time as they occurred. Even in his supplemental *pro se* brief to the Appellate Division, his § 440 motion, and his petition here, petitioner has not pointed to any other instances where Mortenson is alleged to have crossed the line.

Nor can petitioner demonstrate prejudice arising from this procedural default. This is because, in fact, Mortenson never displayed any personal knowledge. The reason petitioner is

forced to rely on his broad argument that Mortenson should have been disqualified rather than pointing to particular instances where her prior exposure to the case mattered is because there were no instances when she demonstrated her personal knowledge as a means of bolstering or discrediting Smith (other than in the Sirois hearing, which of course had no jury and which she did not prosecute).

For example, when cross-examining Smith during petitioner's case about the threats Smith had received, Mortenson was clearly aware of the issue and carefully phrased her questions impersonally by asking Smith what she had told "the District Attorney's office." Although the jury likely concluded that Smith and Mortenson had a relationship predating the date Mortenson examined her at the second trial, there is nothing unusual about that; it is typical for a prosecutor to meet with a key witness before trial. The trial judge, in fact, delivered the standard instruction as part of the charge that "[t]he law does not prohibit a prosecutor … from speaking to a witness about the case before the witness testifies…." So it would have been unremarkable to the jury that Mortenson and Smith knew each other; indeed, the same claim that petitioner raises now, albeit based on a lesser quantity of evidence since some of the threats to Smith had not yet occurred, could have been raised in connection with the first trial.

D.     Suppression of Lineup Identification Claim – Fifth Amendment

In his petition here and in the Appellate Division, petitioner challenged the determination reached in the reopened Wade hearing. The Appellate Division included this claim in its rejection of certain claims as "unpreserved, and in any event, without merit." Breazil, 110 A.D.3d at 913. I am, again, unconvinced that this claim was unpreserved. The only preservation argument that the District Attorney advanced on appeal was that one of petitioner's points in connection with this claim – that "the prosecution had the burden of going forward to prove the

legality of police conduct" – was unpreserved. The District Attorney pointed out that since the prosecution had prevailed at the original Wade hearing, and it was petitioner's motion to reopen, it was petitioner's burden, and his claim to the contrary had not been raised at the hearing.

However, the quoted argument was one or two boilerplate sentences in petitioner's brief. It is clear that what he was really challenging was the result reached by the Wade hearing court. This challenge was on two grounds: (1) the lineup should have been suppressed as incident to his illegal arrest under the Fourth Amendment; and (2) the lineup was unduly suggestive, a due process violation, based on Smith's new testimony at the reopened Wade hearing that the police had shown her a picture of petitioner prior to the lineup and that they had instructed her to pick him out of the lineup. The former argument is addressed above (see supra Section IV). As to the latter argument, since it was petitioner who had moved to suppress the lineup identification and lost, I do not see how it could have been better preserved.

Even with the failure of the procedural bar, the Appellate Division's alternative ruling on the merits again warrants deference under AEDPA. See Zarvela, 364 F.3d at 417. The Court's ruling constitutes a mixed finding of law and fact. Mixed questions of law and fact are evaluated under the standard of whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Overton v. Newton, 295 F.3d 270, 277 (2d Cir. 2002); see also Young v. Conway, 698 F.3d 69, 77 (2d Cir. 2012). The ruling by the Appellate Division did not involve an unreasonable application of federal law.

Petitioner's argument on this point echoes his effort to have me re-weigh the evidence in his legal sufficiency point. He marshals those portions of Smith's testimony that he thinks the hearing court should have accepted and criticizes the decision for rejecting those portions.

However, the factual findings that the hearing court made and that the Appellate Division affirmed were in no way unreasonable. The hearing court carefully evaluated the credibility of each witness who testified and found, based on evidence that it discussed, that Smith was equivocating on her prior testimony because she had been threatened; that petitioner's witnesses had lied; and that the facts as described by the police detective who had conducted the lineup were in fact what had occurred. The hearing court specifically commented on the witnesses' demeanor, finding, for example, as to Smith, that "what I saw was a demonstrated fear in this woman when she testified here today. She is fearful. There is no question about that." Given the narrow standard for reviewing factual determinations on an application for habeas corpus relief and the presumption of correction, see Marshall, 459 U.S. at 434, 103 S. Ct. 843, there is no basis for accepting petitioner's attempt to have re-evaluate the evidence.

## VI. Deprivation of Counsel

In his § 440 motion, petitioner raised two claims that he had been improperly deprived of counsel at various stages of his prosecution.

First, petitioner claimed that prior to his appearance in the lineup at which Smith picked him out, he had been arraigned, and yet he did not have counsel at the lineup. The § 440 court meticulously deconstructed this argument based on the record and showed that, in fact, petitioner had not yet been arraigned when he was placed in the lineup. The § 440 court properly concluded, consistent with Supreme Court authority, that petitioner therefore had no right to counsel. See Kirby v. Illinois, 406 U.S. 682, 688, 92 S. Ct. 1877, 1881-82 (1972).

Second, petitioner contended that he had been questioned by the police after his arrest without being given his Miranda warnings and that he had asked for a lawyer and not been provided with one. However, as the § 440 court found, the prosecution introduced no statements

that petitioner made during any questioning, nor did it introduce any reference to any questioning. Thus, even if petitioner had a Fifth Amendment right to receive warnings or counsel, he suffered no prejudice from the denial of that right. See Perkins v. Herbert, 596 F.3d 161, 177 (2d Cir. 2010).

## VII. Ineffective Assistance of Counsel

A petitioner claiming ineffective assistance of counsel must prove two things. First, petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" according to "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065 (1984). Second, petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. See also Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S.Ct. 366, 370 (1985). In other words, petitioner "must show that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Because this Court only considers whether the state court's determination was unreasonable, and because there is a strong presumption that counsel's assistance was effective, the standard of judicial review applicable to ineffective assistance of counsel claims under § 2254(d) is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S.Ct. 1411, 1420 (2009).

In his *pro se* brief in the Appellate Division, petitioner pointed to several acts or omissions by which he contended his trial counsel had been ineffective. Because some of these required consideration of matters that were not apparent on the record, the Appellate Division declined to consider the point, relegating petitioner to a § 440 motion so that he could introduce evidence outside of the record and the ineffective assistance claim could be considered in its

totality.  See Breazil, 110 A.D.3d at 914.  Petitioner did so and the § 440 court denied his motion.

All of the grounds he raised were meritless and most were frivolous under any standard of review, let alone the deferential standard under AEDPA.  They consist of the following:

A.  Consenting to the Verdict Sheet

The verdict sheet submitted to the jury noted that to be found guilty of either second degree murder as to Kinard or attempted second degree murder as to Porter, the jury had to find that petitioner intrended to cause their deaths, respectively.  The operative New York statute, N.Y. C.P.L. § 320.20(2), provides that when a verdict sheet contains multiple counts, it may include language taken from the particular statute relating to the particular crime if it is necessary to distinguish between the counts.  This meant that it was proper to include Kinard's name as to the murder charge and Porter's name as to the attempted murder charge.  But since both charges required intent to cause death, there was nothing in the statute that permitted the reference to that common element of each crime, as that reference did not serve to distinguish between the crimes.  In his § 440 motion, petitioner complained that his counsel was ineffective for consenting to the inclusion of the "intent to cause death" element.

The § 440 court found that petitioner had failed to satisfy Strickland because there was no prejudice from emphasizing to the jury the most important element that the prosecution had to prove:  "[T]he annotations on the verdict sheet served to remind the jury of this element and clearly benefitted the defense without any accompanying downside."  Not only does the § 440 court's conclusion easily withstand the deferential standard of review under AEDPA, but it is clearly correct under any standard of review.  Petitioner received the unentitled benefit of a

repetition of the heaviest element of the prosecution's burden.  Petitioner's claim that he was prejudiced is frivolous.

B.  Failure to Request First Degree Manslaughter Count as Lesser Included Defense

In his § 440 motion, petitioner acknowledged that he directed his trial counsel not to request that the court submit to the jury the charge of first degree manslaughter, a lesser included offense to the submitted first degree murder charge.  Petitioner contended that his trial counsel should have overruled his direction, and that the failure to do so constituted ineffective assistance.  His attorney submitted an affidavit in the § 440 motion in which he averred that he did not blindly follow petitioner's direction, but formed his own conclusion that petitioner had a better chance of acquittal without the submission of the lesser included offense because the defense had been predicated on the argument that petitioner was not the shooter, the murder weapon had been suppressed, and the eyewitness testimony from Smith was weak (for reasons discussed above).  The § 440 court accepted this explanation, holding that "[f]orcing the jury to choose between convicting the defendant of a serious crime on weak evidence or completely acquitting the defendant, rather than allowing the jmy the option of compromising on a lesser included offense, is a recognized defense strategy, and in this case its employment does not support a finding of ineffective assistance of counsel."

The conclusion of the § 440 court is in no way contrary to or an unreasonable application of Strickland or its Supreme Court progeny.  Cases too numerous to cite have recognized that the decision of whether to request submission of a lesser included offense is a matter well within the judgment of trial counsel.  See, e.g., Gibbs v. Donnelly, 673 F. Supp. 2d 121, 143 (W.D.N.Y. 2009) (even if it would have been proper for the trial court to charge the lesser offenses, "the failure of petitioner's counsel to [request it to] do so in this case amounted to a tactical choice not

rising to the level of ineffective assistance of counsel . . . .") (citation omitted). The record shows clearly that trial counsel reasonably exercised that judgment. Petitioner's point is frivolous.

   C.  Decision not to call Eleanora Carter as a defense witness

   As noted above, petitioner's girlfriend, Eleanora Carter, was a witness to the shooting. Petitioner contended in his § 440 motion that his trial counsel was trial counsel was ineffective for not calling her as a witness because she would have exonerated him. His attorney, however, in his affidavit submitted in opposition to the motion, explained that Carter had given several contradictory statements to the police. Although her first statement to the police exonerated petitioner and named someone else as the shooter, in her second audiotaped statement to the police, given an hour later, she stated that she had received telephone calls threatening to kill her and her baby if she did not exonerate petitioner, and that in fact it was petitioner who had shot Kinard and Porter. Trial counsel opined that under these circumstances, he concluded that it would be inadvisable  to call Carter as a witness because she would not assist petitioner's case. The § 440 court again found that trial counsel exercised reasonable judgment, noting that "calling her as a defense witness at trial to exculpate the defendant would have revealed to the jmy her prior sworn statement asse1ing that the defendant was the shooter and that her originally naming someone else as the shooter was the result of a threat made to kill her and her baby."

   Once again, the trial court's conclusion is not only consistent with Strickland and its Supreme Court progeny, but petitioner's argument is frivolous. Whatever chance petitioner had at acquittal would have gone right out the window once a second witness was confronted with a statement admitting that she had been threatened into exonerating petitioner in much the same

manner as had Smith.  That was the last thing petitioner needed.  Indeed, it is far more likely that trial counsel would have been deemed ineffective if he had called Carter than for not having called Carter.

D.  Decision not to request exclusion of Smith lineup identification at second trial

As discussed above, Smith picked petitioner out of a lineup.  Petitioner contended in his § 440 motion that trial counsel was ineffective for not seeking to suppress the lineup as fruit of the poisonous tree, i.e., the stop and frisk that led to the seizure of the murder weapon that was subsequently suppressed.  The § 440 court rejected that argument on the ground that, when the Appellate Division suppressed the gun and ordered a new trial after petitioner's first conviction, it had expressly upheld the lineup as attenuated from his arrest (on the ground that there was an outstanding parole violation warrant).  The § 440 court reasoned that since "[t]he trial court was bound by the ruling of the Appellate Division that the lineup was lawful …. defense counsel cannot be found ineffective for not making an argument that had no chance of success."

I suppose that if trial counsel had preserved the issue, there would have been a theoretical possibility that the Appellate Division would have eschewed law of the case and chosen to reexamine its earlier decision.  But petitioner offered the § 440 court no reason why the Appellate Division would have taken that extraordinary step; it could just as easily have chosen to consider the point under its interests of justice jurisdiction notwithstanding the failure to preserve, and it didn't do that.  Under these circumstances, I see nothing contrary to or an unreasonable application of Strickland in  the § 440 court's conclusion that petitioner failed to demonstrate that his counsel was objectively unreasonable in not raising an objection that a higher court had already rejected.

## CONCLUSION

The petition is denied and the case is dismissed.  A certificate of appealability shall not issue.  <u>See</u> 28 U.S.C. § 2253(c).  The Court certifies pursuant to 28 U.S.C. § 1915 (a)(3) that any appeal from the Court's Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal.

**SO ORDERED.**

_____
U.S.D.J.

Dated:  Brooklyn, New York
        December 30, 2015